Good morning, Your Honors. My name is Craig Smay. I represent the Ashley Creek Phosphate Company in this matter. The matter involves a claim of the inadequacy of an environmental impact statement under the National Environmental Protection Act regarding the supply to an Idaho phosphate fertilizer plant of phosphate from local reserves. The EIS was done in this case because the Idaho reserves are contaminated with selenium, which creates problems both with respect to forest lands nearby and with water supplies nearby. The fact that an EIS was required in this case activates 42 U.S.C. 43322C, which is a compendium of things that must be considered in an EIS, including alternatives to the proposal, the proposal in this case being local supply to the fertilizer plant. My client, in the course of the EIS proceeding, suggested the alternative of some state land reserves in Utah, which, by virtue of an interstate pipeline and rail connection, are close enough to supply the Idaho plant. Without going into detail about what constitutes an appropriate alternative, it suffices at this point in the argument, I think, to say that an alternative is something which fulfills the purpose of the proposal as well, at least, and which may provide a better environmental result. Does Glask have anything to do with it? Yes, at least in the cases in which what is proposed is an economic proposal, where you are proposing, for example, to exploit federal minerals for profit, then it seems to me that what fulfills the purpose of the proposal has to be something which is on comparative economic basis. What is, in a nutshell, what is your injury in fact? The injury is, as set out, I think, Your Honor, in the recent case from this course, Fosolito v. O'Neill, a procedural injury will be found where a procedure required by the Act is not followed and the plaintiff has a concrete interest which may be affected by the failure to follow that procedure. Okay. And if you have a procedural injury, then you have to have a concrete interest that's related in some geographic nexus to the location where the EIS is taking place. So then what is your nexus? Well, I'm not sure what Your Honor means exactly by geographic nexus. Well, I mean what the Ninth Circuit has said in some of its prior case law. Nexus means connection. Nexus, connection. Oh, I understand, connection. In this case, it seems to me the connection that would need to be shown is more economic than geographic. It is whatever will supply that plant with an appropriate supply of phosphate. So let me just get this straight. So if somebody from Korea said, you know what, we can actually ship some stuff over pretty cheap, then the EIS needs to take that into account as a viable alternative, and the Korean company could waltz into U.S. court and say we've got a procedural injury here, you know, halt the process. Well, setting aside who may sue underneath and whether Korean companies can do that or not, Your Honor, the fact of the matter is the statute says consider alternatives. Alternatives are, of course, circumscribed by the rule of reason. And you have to be ---- Well, how about somebody from Nevada rather than Korea? Nevada, it really raises the question of efficient supply of phosphate to an Idaho firm. No, no, but they can do it just as well. They can do it. They claim they can be an economic supplier, Nevada, Wyoming, somewhere else in the West. Then it seems to me the statute is perfectly clear. It says consider that alternative. It does not say you must decide upon that alternative, but you must consider it, and that is said to be the heart of the NEPA process. Certainly if, in fact, it turns out that you cannot supply phosphate of the same quality, of the same quantity on convenient economic terms, there may be any number of reasons to disqualify a proposal as an alternative. What happened in this case, Your Honor, was that the alternative was proposed and simply refused to be considered. So ---- No consider was considered to be stranded. Okay. But under your theory, then, all anybody has to do is propose an alternative and it's required to be considered? That's what the statute says. And it says it quite plainly. There are numerous implementing regulations under it which are equally plain. Some of them clicked in the back of the brief. So somebody says, you know what, you don't need phosphate. We've got a synthetic. We're DuPont. Therefore, you need to consider. Let's not mine in the North Rasmussen Ridge because DuPont maybe can come up with a synthetic. We don't even need phosphate anymore. Would they have standing to come in? I think they would have standing to complain if, in fact, consideration was refused. The issues Your Honor is raising are part of the consideration which should have been granted and was not granted in this case. And so I think we're getting somewhat afield ahead of our time. Well, we're not getting afield because the standing rule that you would have us adopt, if I understand it correctly, is that anybody that proposes an alternative, which is not considered, has standing to come in and challenge. Is that the rule? He may certainly raise his alternative. He's entitled to whatever consideration the statute requires. If, in fact, he has a colorable claim that that consideration was refused or that it was failed to be honored in an appropriate way, then it seems to me he has standing to complain of failure of the act. Yes, I think that's true. But, I mean, if here's the difficulty I'm having, so if you can help me out. All right. You've got this place over here, this North Rasmussen Ridge, and there's concerns about mining in that area because of environmental impacts. Correct. Does that environmental impact on that ridge have anything to do with your economic interest over here in this other 250 miles or however far away it is? Well, of course it does because the statute says in order to carry out the environmental purposes of the act, you must consider other alternatives. If there is an alternative which is as good in fulfilling the purpose but better environmentally, doesn't cause selenium poisoning somewhere or any other kind of poisoning, then that must be considered. It doesn't say that that must be. Is your alternative equivalent to a no-action alternative? In other words, we're not going to mine here, we're not going to go forward, we're just nothing's going to happen, end of story. Then if somebody wants to go over here and buy from your client, they can, but we're not going to do anything with Rasmussen Ridge. Why isn't that the equivalent? Because you need to know whether or not there are viable other alternatives to make a decision whether to implement the no-action alternative. No, but isn't the viable alternative related to the project and the location on which we're performing the EIS? It is certainly from the standpoint of selenium contamination, and if Your Honor were making that decision and found that there was another equally practical and economic alternative which didn't cause the selenium problem, then it seems to me that as the BLM, the Forest Service, Your Honor would be entitled to say, we will not take action on your proposal. You have a better proposal elsewhere. It's cheaper for you, it's better for us. Do that or find another alternative of your own. The question isn't whether it's necessarily cheaper to go elsewhere. The question is what's the environmental impact on North Rasmussen Ridge. Exactly. And that must have anything to do with North Rasmussen Ridge, correct, your client? My client doesn't have a property on North Rasmussen Ridge. But the exploitation of my client's property would relieve North Rasmussen Ridge of the mining which would go on there causing selenium poisoning. That is the point. And if that were done and you avoided the selenium poisoning, then you have complied and furthered the purposes of the act. So in other words, if they're doing an EIS in Wyoming or Nevada, Idaho, on some oil drilling, all somebody has to do is, ARCO needs to say, you know what, you can get oil from us. We've got plenty of oil in Alaska. You don't need to go forward with that oil project down there in the Rocky Mountain West. Would they, does that give them standing to come in and participate in the EIS process? Well, anyone has standing to participate in the EIS process, Your Honor. But I mean to challenge the decision. If, in fact, they make a proposal which is not given the consideration it deserves, and that's a question which Your Honors are not asked to make, it's to be made at the BLM level, then certainly they have the standing to object that, in fact, the procedures were not followed. If they came in tomorrow and said, let's mine downtown Seattle for gravel and disrupt the entire city and tear the courthouse down, but you can- Spring Street. Wherever. There was some gravel. Wherever. Spring Street. But there is a proposal to mine that's out in Heck and Gone where it's not going to bother anybody. Is Your Honor proposing to say that the guy who says, I'll give you a job twice as cheap without the problems, 50 miles away, has not the standing to come in and say, here's a viable proposal, and if the BLM says, buzz off, we're not even going to talk to you, he doesn't have the standing to say, wait a minute, you didn't comply with the procedures set out in 42 U.S.C. 4332. It says you must consider those alternatives. Alternatives related to the environmental impact on Spring Street or the gravel or North Rasmussen Ridge. Well, supposing you get the gravel somewhere else, you relieve Spring Street. If you get the phosphate somewhere else, you relieve North Rasmussen Ridge. That's in the nature of the word alternative, it seems to me. That's what you are supposed to be considering, substitutes, effectively, for the proposal. Do you have any case that extended standing to this degree, whether in this circuit or elsewhere, that we could look to for a little guidance? Well, Your Honor might want to look carefully at the recent Sausalito v. O'Neill case. That comes down ultimately under other statutes, but it presumes standing in the city of Sausalito in circumstances very like this. There the court says, a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared under the National Environmental Policy Act, and when the plaintiff also alleges a concrete interest that is threatened by the proposed action. There the concrete interests of the city of Sausalito were proprietary interests, much like the proprietary interests of my client in seeing that these minerals are properly exploited. Counselor, am I wrong or right in saying that the excerpts of record indicate clearly that the government had considered your alternative, but had determined it was not a viable way to supply the condo plant? No, it never got to that stage. They didn't. They didn't make an investigation and determine that you're that you're that you're you're phosphate was not a viable way to. None whatever. This record is wrong. Was it in the record? No. What transpired was. It was in the record. Was it not? Excuse me. Your claim was considered in the record. Was it not? My client filed a letter saying these leases exist. They are better for the various following reasons, and we would proffer the following evidence. The BLM said we do not have to consider that. Okay. When we then protested, lots of extraneous material was put in the record after the close of the EIS proceeding, all of which is one sided about how it's too far away and so on. But nothing transpired in the EIS proceeding, which is, of course, where it must transpire in order to comply with the statute. All of that is outside the record of the EIS proceeding. This use of your facility depend upon the negotiation of a contract with the ultimate consumer. I may be not hearing properly this morning, Your Honor. The use of your facility, is it dependent upon the negotiation of a contract of purchase by the ultimate consumer? Ultimately, that's true. They can say yes or no. Whatever price you set on it, you're saying still that's the viable alternative. No, I don't think that's so, Your Honor. I think that the BLM would be perfectly entitled to say in the course of the proceeding, are you going to give us a commitment for price here so that we can make a proper decision whether this is economic? And if you were inclined to do that, I think they'd be entitled to say, well, sorry, we can't make a judgment about your alternative. But your complaint or your representation to consideration didn't set a price, right? No. We had had substantial discussions with Agrium as the operator of the fertilizer plant in advance. In fact, you couldn't agree with them, right? You couldn't come to an agreement. When you looked at transportation costs plus product costs, it was not economically viable, right? They claimed that it was not. In BLM, I'm looking at the BLM response to Ashley Crick's comments when they go through this and they say the letter received by Agrarium from Mr. Archer indicated the potential purchase of ore from Ashley Crick was not economically feasible in short term or long term. And then BLM, you know, discusses here that it's gotten your comments, but it's not required to perform a comparative economic analysis. Again, that's all after the fact that, in fact, the recitation of the letter is simply incorrect. There is no such letter from Mr. Archer to anyone. It simply doesn't exist. And we pointed that out to BLM, and I think they understood that that was the case. But, again, these are issues. They made that up? I'm not sure where the confusion came from, Your Honor, but the letter, if you look to see if you can find this letter from Mr. Archer, it's not there and it doesn't exist. Okay. In point of fact, what had transpired was a substantial course of negotiations, and ultimately what Agrarium said was we don't think that we can get the stuff cheap enough. And it raises the question whether, supposing that my client is correct that it is cheaper, why didn't they go for it? And why in the ordinary course don't these alternatives, which are economic, get taken up by the proponent? Well, the reason may be that if, in fact, you have an entirely uncompetitive situation, anti-competitive situation going on in phosphate development in the West and particularly in Idaho, you may have decisions like that made which are not economic, which respond to a situation which is not economic. Just help me out again. When they say alternative two, which is the no-action alternative, in other words, we think that their environmental concerns suggest that nothing should be done here. Right. Okay. Why isn't that the same, in effect, as saying, okay, we're not going to develop Rasmussen Ridge. So when that happens, then obviously there's less phosphate and people can buy, have to buy elsewhere in the market, which could be your client, maybe it could be somewhere else. So why isn't that really the same thing? It would be, except what Your Honor is missing is that they did not activate the no-action alternative in this case. And the reason that they didn't is they didn't get themselves informed about alternatives. Had they known that there were viable alternatives, which were economically and environmentally more sound, perhaps they would have said, we won't take action here. We're not going to use the federal resources in a way which is environmentally unsound. You need to go elsewhere. In point of fact, they never got to that stage because they simply declined to consider any other alternatives. And that is the problem. Your interest is solely economic? The interest of my client is. Is it economic, solely economic? Yes or no? I would not call it solely economic, no. It isn't. What is it if it isn't solely economic? The benefit to my client is as the proprietor of the reserves. But the statute says. That's all you want to do is sell product to this customer, right? My client wishes the market to be expended to consider these reserves. He doesn't want to sell product to this customer? Oh, if he can, he would like to, yes. Is there any other customer that's involved? At this moment? No, not that I'm aware of. At the time of the hearings? No. There was no supplier who might have been involved. Then he has no environmental interest in this project. The statute says he does. The statute says that if he provides a better alternative, which is better environmentally, he's to be considered. And the statute wouldn't require the consideration of alternatives. I would analogize the situation to the situation in the National Credit Union where the complaint was that a regulation had been passed, which was not authorized by the statute because it allowed federal credit unions to expand their markets beyond what the statute might require. Commercial banks were given standing in that case because their interest was in restricting the markets, as the statute seemed to contemplate. My client's interest in this case is in expanding the markets, as the statute seems to contemplate, to include other viable alternatives having a superior environmental result. Those are environmental concerns. Yours is purely economic concern. And, in fact, a purely economic concern is a proper ‑‑ a proprietary interest is a proper basis for standing, so long as there's a concrete interest which will be affected by failure to follow the procedures under the Act. Okay. You're already in a deficit position here, so I think we'd better hear from the other side. Good morning, Your Honors. My name is Bob Grisham.  I've got 20 minutes. I'm going to try to save 10 minutes or so for my co‑counsel, Mr. Miller, who represents Agrion. Your Honors, this should be a fairly straightforward standing case, and, in fact, that's how the district court treated it. It's undisputed in this case that the plaintiff, Ashley Creek, claims no interest in the Idaho environment, and the court in this decision noted that fact. Relying on a prior Ninth Circuit case, the Nevada Land Action Association, which held that one asserting solely an economic interest has no standing under NEPA, the court dismissed this case on the basis of lack of standing. And in doing that, it relied on prudential standing, not Article III standing. It found that the zone of interests that are sought to be protected by the NEPA statute are environmental interests and not solely economic interests. And because Ashley Creek claims only an economic interest, it dismissed the case. You know, we feel, Your Honor, that if the theory that's propounded by Ashley Creek is accepted, and essentially what they're arguing is that they attempt to distinguish the decision to do or prepare an EIS from the actual preparation of the EIS itself. In other words, Ashley Creek argues that in deciding whether or not to prepare an EIS, one can challenge that decision only if they have an interest in the environment. But once the decision has been made to prepare an EIS, essentially NEPA is intended to protect anybody who is at all affected by any deficiencies in the EIS or by what the EIS concludes. And those people then have standing or fall within the zone of interests protected by NEPA and can file a lawsuit. It's our position, Your Honor, that clearly that is not the case and, in fact, would open the door to a multitude of lawsuits from people who simply have no interest in the environment, who have a solely economic interest. And the final analysis wouldn't really further the purpose of NEPA, which is to protect the environment. In a nice circuit, it's very clear that that's the case and it was very clear in the Nevada Land Action Association. The Court asked the ---- I guess we do have this issue, if you go back to Bennett v. Speer, where in the Endangered Species Act, which in some ways is similar, although it's a substantive statute, as you know, an economic interest can give you standing. Why would it be different here? Well, I think Bennett v. Speer is distinguishable, Your Honor. Bennett did say, and, in fact, the plaintiffs in this case argue, at least implicitly, Bennett overruled the Nevada Land Action case. But Bennett is, in fact, distinguishable. Bennett involved the Endangered Species Act and it involved a section of that act which required that in doing a biological opinion that the agency must consider the best scientific and commercial data available. And my understanding of what the Supreme Court held is that that provision creates a substantive duty on the part of the agency to devise a plan that essentially is not uneconomical, that does not result in economic displacement. That's a substantive duty that the ESA has that is not present in the NEPA statute. And, in fact, the Arizona Cattle Association, which we've cited in our brief, addressed that very issue and pointed out that the EIS provision under NEPA is simply a procedural provision of NEPA. And, essentially, it ties back into the overall purpose of NEPA, which is to protect the environment. So we believe that Bennett is distinguishable because it involved a statute or a substantive statute, which is not the case with NEPA. When you asked Mr. Smay whether there were any cases that supported his position, he did cite a case in his brief, an Eighth Circuit case, which he didn't discuss and Your Honors didn't discuss, but I think it bears some mentioning. In that case, the Eighth Circuit relied on Bennett and held that the EIS provision of NEPA is intended to protect economic interests. And we argued in our brief to the extent that that's what the Eighth Circuit held. It's simply inaccurate. It's not the case. And what the Eighth Circuit did in holding that Section 102C3 addresses or protects economic interests is it relied on the implementing regulations that talk about the human environment. And what those regulations say is that when you have economic interests that are interrelated with the environmental interests, the environmental concerns, then the EIS has to discuss both of those. And from there, the Eighth Circuit took the leap, then, that Section 102 must be intended to protect economic interests, and so one asserting solely an economic interest has standing to challenge the adequacy of an EIS. A couple of points. Number one, it's to be noted that in that case, the outfitter has not only addressed economic concerns, but they also addressed, as the Court noted, some interest in the environment. And so we believe that Friends is distinguishable from the present case. But in addition, a couple more points is that that regulation was discussed in a subsequent case, the town of Stratford, which we cited in our brief, which noted that in determining what the zone of interest are, it's not appropriate to look at implementing regulations. What is appropriate is to look at the actual purpose of the statute. But nevertheless, if you even were to consider that regulation, it talks about the interrelation between economic interests and environmental interests, and at that point, the EIS has to discuss both. In this case, we don't even have that. Ashley Creek is not alleging any interest in the environment, so there is no interrelation between the environment and their economic concerns. They're alleging solely an economic injury. So we think that Friends of the Boundary Water and Wilderness Area case is distinguishable, and to the extent it's not, it was simply incorrectly decided that the district court case of the Arizona cattle is really right on point in noting that NEPA, the overall purpose of NEPA, is to protect the environment. And each of NEPA's sections are procedural, and they're procedural in the purpose of that process is to result in a decision that protects and does not harm the environment. Well, in these cases, they usually concern themselves with an awful lot of money. And why shouldn't the government, because it involves an awful lot of money, consider economic interests? You don't have to protect economic interests, but why shouldn't the government consider economic interests? Well, I think, Your Honor, that the regulation provides that they should interrelated with the environmental interests or concerns that are present on it. In this case, did they consider the economic interest of the plaintiff? No. In fact, what they did, Your Honors, and I'll just quote, is they did consider the alternative. And what they said was, it is the agency's responsibility to respond to this request and either approve the plan of operations as proposed, modify the mine plan with alternatives, or disapprove the operations with the no-action alternative. As such, a comparative analysis of the costs or other environmental factors of mining North Rasmussen Ridge with other viable phosphate reserves is not within the scope of this analysis. The fundamental question to be decided by this NEPA analysis is not how the fertilizer plant will be fed, but if the North Rasmussen Ridge reserve will be mined at this time. And I think that's analogous. What if Ashley, who is 250 miles away, Pardon me? What if Ashley, who is 250 miles away, could furnish the phosphate twice as cheap as it could have been if it were mined by whoever it was? Why shouldn't that be a factor? Because that's not one of the factors that NEPA is designed or was passed to protect. NEPA was not passed to ensure that every project Well, I understand. You're protecting the environment. But why shouldn't economic factors, cheaper, less economic impact, be considered? Because that's not what NEPA is designed to do. You could come up with a number of other factors in any project that could or could not be considered, but the NEPA requires the government to consider environmental factors and economic if they're interrelated with the environmental, but they're not required under NEPA to consider solely or base their decisions solely on economic factors. And that's to be contrasted with the Bennett case, which talked about the ESA or involved the ESA, and in that case, the Supreme Court held that the ESA did require the government to consider and take into account the economic impact of its decision and to assure that essentially that their decision was an economic decision. Would the BLM be within its authority to list as an alternative going to the Ashley Crick mine? Would that be an alternative that it could have analyzed within its authority? Well, I think when you get into the merits, you start talking about what's a reasonable alternative. And I think the analogy that I'm not asking whether it would be reasonable or not. I'm just saying would that be within its scope, the scope of NEPA, to say an alternative here is no action on this site because we can mine over here in this other location? If I understand your question, Your Honor, I think that they could select a no-action alternative because of the environmental consequences that would occur through mining, through any other alternative of mining are so severe that they select a no-action alternative. But I don't think that they would – I mean, I think your analogy is appropriate. I think what Ashley Crick is talking about is a no-action alternative. They would not select, I don't think, an alternative that's based solely on economic considerations of mining some other mine or getting the ore from another mine because it's more economical. I don't think that they could or should or would do that. There wouldn't be any ecological damage either if they walked from Ashley. I mean, I think the analogy that, Your Honor, of the proposal to drill an oil well in Wyoming and an oil company from Alaska coming in and submitting an alternative that says, you don't have to drill in Wyoming. We can supply the oil that you need at lower cost. And that oil company has absolutely no interest in the environment in Wyoming. And the agency involved with the EIS process would take a look at that and say, well, you're right. You can get it cheaper in Alaska than you can here. And if you do it in Alaska, you don't have to drill so there's no economic harm. So we're going to pick that alternative. And that simply wouldn't happen. It would be the no-action alternative. And then if that company decides to sue, that brings us to the whole reason and purpose for prudential standing, is the Alaska company has no interest in the Wyoming environment. And it may have presented an alternative with absolutely no environmental consequences. And it could argue, you know, it's not simply economic, but our alternative wouldn't result in any harm to the environment, and so we're going to sue. And that's the whole reason behind prudential standing is because they don't have an interest in the environment that was affected by the project. And so they don't have prudential standing or they're not within the zone of interest that are designed to be protected by me. Actually, it does not show environmental comfort or damage one way or the other. Pardon me, Your Honor? In this record, there's nothing that shows what damage actually may or may not create, right? That's correct, Your Honor. And so you can't say to the company, go haul your phosphate from down there and do all the environmental damage you want because we're going to protect the one here. Is that right? I think that's correct. And I've got about six minutes left, and I'd like to, unless the Court has additional questions, ask Mr. Miller to respond. That's fine. Thank you. Good morning. My name is Zach Miller. I'm an attorney for New West Industries, Inc., which goes by the name of Agrium Conde Phosphate Operations, commonly known as Agrium. I think it's important to keep in mind that this is a standing case, and the issue is whether this party has standing both under Article III and under the zone of interest test. And it's tempting to somehow slip into analyzing whether the scope of alternatives and so forth is appropriate. But in that context, there's also some confusion about the fact that this is a long-existing mine we're talking about, on long-existing leases with very elaborate infrastructure, and the North Rasmussen extension is the proposed action that triggered NEPA by requesting approval of a mine plan from BLM as well as the Forest Service. And so the range of alternatives that would be looked at there relate to whether and to what extent the extension of that mine makes sense. In that context, the administrative record reflects that Agrium, at Ashley Creek's invitation, had carried on a business discussion with them about whether these completely undeveloped phosphate leases, with no infrastructure, no permits, no environmental studies, no work at all, no customers, that, as the Chevron case in the Tenth Circuit indicated, Ashley Creek has been trying to peddle to various people for over 40 years, engaged in ongoing litigation, somehow might serve as a future long-term ore reserve, not as an alternative to this immediately adjacent expansion, which BLM and the Forest Service approved in part because this recently discovered selenium problem and some of the overburden associated with all the phosphate mines in this area, that this North Rasmussen expansion would actually be a mitigation measure for those existing operations, as we discussed with the various environmental groups and the agencies and so forth. So Ashley Creek's claim coming in that context was, if you're not going to do business with us, we're going to go up and complain about your ongoing operation here, got it enjoined in the IVLA appeal process, and so forth. But the Court's question about is there even injury in fact under the Article III analysis is exactly right. There is no environmental harm that would result at all, but specifically to Ashley Creek. They have not only not alleged any specific harm, but they have expressly conceded they have no interest in the local environment at all. In addition, the Boundary Waters case that Mr. Grisham mentioned, I think this is probably the only area where we take a little bit of issue with the United States. In their brief, argued that the Eighth Circuit was incorrect there and this Court should not follow the Eighth Circuit. We think that that case, as well as some other cases related to that, are clearly distinguishable. What Mr. Smay has pointed out and argued is that when and to the extent there is an environmental issue and a significant impact on the environment that triggers NEPA in the first place, and you prepare an EIS, that the statute does require other social and economic considerations to be considered. And so what happened in this EIS, BLM did look at the environmental impacts, came up with numerous mitigation measures, did look at some of the local social and economic impacts, and that's not what Ashley Creek is complaining about. They're not saying, as in the Boundary Waters case where the outfitter said, you need to look at the impact on the local economy of changing the Wilderness Administration plan for this area because it's going to affect our business, but it's also going to have a direct impact on our recreational and aesthetic interests and so forth because of the environmental impacts. Here, it's not NEPA's consideration of local economic or regional economic impacts. Ashley Creek is essentially saying, when you prepare an EIS and I propose as an alternative that you do business only with me, that that is an economic consideration that somehow the agency has to consider. And that's not what the statute says, that's not what the Eighth Circuit said in the Boundary Waters case, and that's not what any other case cited in any of these briefs have said. All of those economic consideration cases are talking about an analysis of economic impacts, not a consideration of an economic interest of a party. The Eighth Circuit, I think, itself has spoken to this issue to some extent in cases after Boundary Waters in the Central South Dakota co-op case that's cited in the briefs as well. The Eighth Circuit itself, in a grazing challenge by an association very much like this court's Nevada Land Action case, said this grazing association is challenging these grazing regulations solely for its economic interest. It hasn't really alleged an environmental interest that it itself will suffer. It says in a sort of broad way that it's going to affect wildlife habitat, but the grazing association per se does not have an interest or purpose in protecting wildlife habitat. But more fundamentally, their sole interest in that case was economic, and the Eighth Circuit reiterated the longstanding test of that court as well as this court that its solely economic interest alone is not and never has been enough under NEPA. And I think this court itself has already sort of given some excellent examples of the sort of parade of horribles that would follow from this. In every situation where there's an EIS, if a party with a business axe to grind could propose as an alternative that the proponent, the proposing actor, do business only with that person and thereby acquire standing and could force every federal agency who is building a wing on a Veterans Administration hospital or a new runway for an airport or any number of federal actions to consider in detail and do a detailed cost-benefit analysis of that proponent's action and have access to the courts as a hammer to force that person to do business with them, would totally override the purposes of NEPA, which is clearly not what Congress had in mind. And so if you have no questions, I think I'm done. I think there are no further questions. You may have a minute for rebuttal if you need it. Very quickly, Your Honors. If you look at the National Credit Union case, you will find that there is no need to show an intent of Congress to benefit Ashley Creek. The purpose here is not to require them to consider the economic interests of Ashley Creek, nor is it necessary for Ashley Creek to have a particular environmental interest. Boundary Waters, Bennett v. Spears, the Rosebud suitcase all make that perfectly plain. The question is, do they have to consider alternatives? If they have to consider alternatives, and to answer Your Honor's question directly, could they then say this is better economically and better environmentally, we're not going to let you proceed to pollute the federal reserves? Yes, they certainly can. There's no question they can do that. The question is, can they do that without having considered the economics of the situation? That answer is no. In order to show that the alternative exists and is one which can be imposed or can be opted for, they need to go and look at the economics of the situation and see that the actual alternative is as good economically. Thank you. In doing that, they benefit Ashley. Thank you, Mr. Zimay. I think we have your point. And the case of Ashley Creek v. Norton is submitted. Thank counsel for your argument. It's an interesting issue you've brought to us.
judges: Ferguson, Beezer, McKeown